# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 17, 2012 Session

## JOEL ERNEST BLANTON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for White County**
**No. CR-2079      David A. Patterson, Judge**

---

**No. M2011-01454-CCA-R3-PC - Filed October 9, 2012**

---

A White County jury convicted petitioner, Joel Ernest Blanton, of one count of rape of a child and two counts of aggravated sexual battery, for which the trial court ordered an effective twenty-four-year sentence. Following the direct appeal, petitioner filed a petition for post-conviction relief alleging several instances of ineffective assistance of counsel. On appeal, petitioner pursues only one claim of error, that trial counsel was ineffective for failing to obtain visitor logs from the Tennessee Department of Correction ("TDOC") that could have been used to impeach the primary material witnesses against him. Following our review of the record, the parties' briefs, and applicable case law, we agree with petitioner and reverse and remand this case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

G. Jeff Cherry and David H. Veile, Lebanon, Tennessee, for the petitioner, Joel Ernest Blanton.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Randall A. York, District Attorney General; and Beth Willis and Douglas Crawford, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Facts

### A. Trial

On direct appeal, this court summarized the facts developed at trial as follows:

T.M.,[1] a twelve year old girl, testified that she had known the Defendant[2] for eight years and that he was related to her stepfather, Bobby Blanton. T.M. described her relationship with the Defendant by saying they "were like brothers." T.M. recounted that she lived in a trailer with her mother, her older sister, her twin sister, and her mother's friend Pam Gibson. T.M. acknowledged that her stepfather was imprisoned in Nashville and that her mother visited him regularly. During one of those visits, on a date that T.M. could not recall, bad weather forced her mother to spend the night in Nashville. T.M. said that, on that night, she shared her usual bedroom with her twin sister S.M.; B.M., her older sister, slept in their mother's bedroom. T.M. stated that, while she was sleeping, the Defendant "crawled in between [her] and [S.M.] and he [woke her] up by sticking his finger down [her] pants and then in [her] vagina." She was wearing underwear, pajama pants, and a t-shirt at the time. T.M. said that "[i]t hurt" and that she asked the Defendant to stop. She said the Defendant "asked if it felt good." After the Defendant removed his hand from inside her pants, "[h]e just rolled over and [she] just rolled over and went back to sleep." T.M. said she did not observe the Defendant touch S.M.

When Gibson and B.M. entered the bedroom "to check on [the girls]," at some point later that night, T.M. "went to the bathroom to change to shorts." She stated that "[i]t hurt when [she] used the bathroom." After using the bathroom, T.M. returned to bed, where the Defendant remained between her and S.M. When the Defendant eventually left the room, he put his finger over his mouth and said "shhh." T.M. related that she was scared because she thought that he meant "[d]on't tell anyone." T.M. said when she told S.M. what he had done to her, S.M. disclosed that the Defendant had done the same

---

[1] Consistent with this court's policy, the identity of minor victims of sexual offenses is referenced by their initials only.

[2] Petitioner was referred to as Defendant in the direct appeal.

thing to her. The next morning, T.M. noticed "spots of blood in the thing when [she used] the bathroom." That same morning, T.M. neither spoke to the Defendant nor told her mother about what happened. She said she "was scared that if someone found out that [the Defendant] was going to do something." T.M. told her mother what happened two years after the incident.

On cross-examination, T.M. said Gibson's children, Jonathan, Cody, and Nickie, were at her house the night of the incident. T.M. stated that the Defendant had not visited her house since the incident. She also said that she first told B.M. about the incident and that she then told her mother.

S.M. testified that she had known the Defendant about eight years. She said she shared a bed with T.M. the night her mother was "snowed in" in Nashville. B.M. usually slept in the same room but slept in her mother's room that night. She said the Defendant came into her bedroom and lay in the bed between her and T.M. S.M. recounted, "I don't know what was happening, but he was faced towards [T.M.]. And then like five minutes, I think, later he turned over to me." She continued, "I don't know how it got started . . . but he had stuck his hand down my pants . . . . [And he] stuck his finger up my vagina." S.M. said the Defendant asked her "if it felt good." She said she told him to stop, but he kept his finger in her for "probably over five minutes." She said he then "stopped and he turned back over and then [she] fell asleep." As the Defendant left the room, "he turned around and he put his finger over his mouth and said [']shhhh, don't tell anybody.[']" S.M. said she talked to him the next morning, and she did not tell her mother about the incident for over two years.

On cross-examination, S.M. testified that she did not tell anyone about the incident even after she told her mother. She initially agreed that, the morning after the first incident, the Defendant touched her inappropriately again, but, upon further questioning, she denied remembering the second incident. On redirect examination, S.M. clarified that the second incident occurred on the same night as the first and was before dawn. She said that she thought something had happened to her sisters that same night. On recross-examination, S.M. further clarified that the Defendant touched her the second time while it was still dark outside but after her mother and Gibson had gone to the store.

B.M. testified that she knew the Defendant as her stepfather's cousin. She said he came to their home "on many occasions." She said she felt she

could trust him and was comfortable around him. B.M. related that the night the Defendant was in her home, she began the night sleeping in her mother's room with the Defendant, Gibson, and Gibson's son Jonathan. At some point during the night, Jonathan became ill, and Gibson took him to another room.

Recounting how the Defendant inappropriately touched her, B.M. said, "I felt something wet against my back and for some reason I just had a strange feeling and jumped up and I was like [']no, no, no.['] And he was like [']all right, all right, I won't do anything.[']" She was wearing shorts, a shirt, and underwear at the time. B.M. continued, "So I got back in bed and I went to go back to sleep and he turned me over and took down my pants and started messing around with me down in my lower area." B.M. said, "[The Defendant then] took his finger and was playing around where I use the number one out." He asked her "if it felt good," and he kept his hand on her genital region for "a minute [or] two." She said that after he stopped "[they] were laying there and then he went up under the covers and [she] felt him kiss [her] stomach and then [Gibson] came in the room and he jumped from where he was laying with [her] like over to the other side of the bed." After Gibson walked into the room and saw B.M. and the Defendant in the bed, she called for B.M. to come into the hallway. B.M. recalled that the Defendant then told her not to say anything. When B.M. arrived in the hallway, Gibson asked B.M. if anything happened, and she said no. B.M. said she spent the rest of the night sleeping in the bedroom with her sisters. B.M. told her mother about the incident two years after it happened.

On cross-examination, B.M. said Gibson was dating the Defendant on the night he stayed at their house. B.M. said she felt the Defendant "[take] his finger and like right there where you pee at he was rubbing around right there in that area." She said she "felt his nails scratch [her] and that hurt." She also said the Defendant came to their home after the night of the incident to help shave their dog.

Tammy Blanton, the mother of the victims, testified that between January 9, 2001, and February 22, 2001, she lived with her three daughters and Gibson in a trailer in Sparta, Tennessee. B.M. was ten years old, and T.M. and S.M. were seven-year-old twins. Tammy recalled that one night during that time period, she visited her husband while he was incarcerated in Nashville. The roads became snowy, so she stayed in Nashville for the night. Tammy said her children were at home with Gibson and Gibson's three children. Tammy said the Defendant visited her home often while they lived at the trailer.

Tammy testified that, two years after the incident, her daughters told her what the Defendant did to them. She said she called the police, who, along with Children's Services, questioned her daughters. She also had them physically examined by a nurse practitioner.

On cross-examination, Tammy said that she had a "great" relationship with her daughters.  She admitted she was convicted of felony theft in 2000. She said the Defendant visited her house twice after the night of the incident, and she has talked on the telephone with him since the incident. On redirect examination, Tammy stated that she successfully completed her three year probation period for the theft conviction.

Pam Gibson testified that she lived with Tammy Blanton, B.M., S.M., and T.M. in the trailer. She was dating the Defendant during the early months of 2001. Gibson said that, during the night that Tammy stayed in Nashville, Jonathan and B.M. were in Tammy's room with her and the Defendant. During the night, Jonathan became ill, so Gibson took him to sleep in another room. When Gibson returned to the bedroom, "[B.M.] was laying against the wall and [the Defendant] was right up against her with his arm around her." The Defendant "jerked his arm back" when he saw Gibson standing there. Gibson asked B.M. if anything happened with the Defendant because she "had a bad feeling" that the Defendant had done something to B.M.  B.M. denied that the Defendant had done anything. Gibson said that, after she had B.M. move to the other bedroom to sleep, Gibson played on the computer with the Defendant. She said he then went outside, and she "could hear he had been hitting his fist or something against the outside of the wall or the porch." Gibson did not mention any of her suspicions to Tammy because B.M. denied that the Defendant did anything. Gibson added that, at some point that evening, her cousin and her cousin's boyfriend stopped by the trailer for ten to fifteen minutes to drop off cigarettes and Mountain Dew.

On cross-examination, Gibson clarified that she was asleep in bed with Jonathan, B.M., and the Defendant. Her cousin then arrived, and Jonathan subsequently became ill.  Gibson explained that the Defendant spent the night at the trailer because he was "going to [Guard] drill the next morning." Gibson admitted she had been convicted of passing worthless checks.

Gibson then answered the jury's questions. She said the children went to bed around 8 P.M., and she played on the computer until some point before midnight. Her cousin also came to the trailer at some time before midnight.

Gibson stopped dating the Defendant soon after the incident, but the Defendant continued to visit the family after they moved houses. Gibson said she did not know whether the Defendant went into the room the twins were sharing.

Detective Chris Issam with the White County Sheriff's Department testified that he was the lead detective investigating this case. He said the Defendant admitted to being present at Gibson's house the night in question and sleeping in the same bed as S.M. On recross-examination, Issam stated that the Defendant had always denied touching the girls.

For the defense, Linda Stover, a family nurse practitioner, testified that she performed a physical examination, which included a genital area exam, of B.M., S.M., and T.M. She said that all of the girls had their hymenal rings still intact with "no sign of injury, tearing," which was normal for the girls' ages. Stover also stated that she could not determine whether someone had "stuck their hand or finger inside [their] vagina[s]."

On cross-examination, Stover said that Tammy brought the girls in for the examination and was present for each examination. Stover acknowledged that, unless the touching occurred over a prolonged period, physical evidence of such contact was unlikely to remain, given that the incident was two years prior to the examination. On redirect examination, Stover said a tear in the hymenal ring could cause bleeding. On recross-examination, Stover stated that being scratched or falling off a bicycle could also cause vaginal bleeding.

Dana Goney, the Defendant's girlfriend, testified that, when she visited the girls' house with the Defendant in 2004, "[the girls] were cutting up and laughing with [Goney] and [the Defendant]. The oldest one was trying to shave the dog's hair and had asked [the Defendant] to help her." She did not perceive the girls to be afraid of the Defendant.

The Defendant testified that he was nineteen or twenty years old at the time of the incident. He stated that he had four children at the time of trial. He also said that he was around the girls' house eight to ten times after February 2001 and that they never acted afraid of him. The Defendant denied touching B.M., S.M., and T.M. The Defendant admitted having previous convictions including criminal impersonation, theft, and forgery.

-6-

On cross-examination, the Defendant testified that he used to be like a brother to Bobby Blanton. He believed that either Bobby or Tammy "put [the girls] up to" accusing him of rape. The Defendant denied being at the house the night Tammy was away in Nashville. He said that he did not spend the night at their house but that he visited the house later to show Tammy his new truck. The Defendant then admitted to every conviction listed on his criminal record.

When answering questions posed by jury members, the Defendant stated that he had three children by his ex-wife and one child by Dana Goney. He said he broke up with Gibson because she could not have children, and he wanted to have children.

After hearing the evidence, the jury convicted the Defendant of one count of rape of a child and two counts of aggravated sexual battery.

B. Sentencing Hearing

Mark Ledbetter of the Probation and Parole Department testified about the pre-sentence report that he prepared. He listed the Defendant's convictions, which included: three counts of forgery up to $1000; two counts of theft of property valued between $500 and $1000; two counts of theft of property valued less than $500; unlawful possession of a firearm; criminal trespassing; possession of a weapon with the intent to go armed; AWOL from National Guard; criminal impersonation; and contributing to the delinquency of a minor. At the time of the sentencing hearing, the Defendant also had a pending charge of felony escape from jail. Although the Defendant claimed to have earned his GED, Ledbetter had not been able to verify that. On cross-examination, Ledbetter acknowledged that the Defendant had only one conviction before the date of the incident.

Dana Goney, the Defendant's girlfriend and mother of two of his children, testified that she would like the Defendant to have a short sentence so that he could help her raise the children. She said that she felt the Defendant had treated her well. On cross-examination, Goney stated that she did not aid the Defendant after he escaped from jail and that she knew he escaped by reading the papers and receiving a phone call from the Tennessee Bureau of Investigation. Goney also said that she considered the Defendant a good father notwithstanding his multiple convictions.

Darlene Blanton, the Defendant's mother, testified that the Defendant had five children. She described him as a good father and said his children ask for him daily.

Teresa Blanton, the Defendant's older sister, testified that she was close to the Defendant. She described the Defendant as "the peacemaker" with a "big heart."

Roy Glynn Blanton, the Defendant's father, testified that he will likely be deceased when the Defendant is released from prison. He added that "[the Defendant has] been a real good father to his children and he's always been honest."

David Yates, the Defendant's uncle, testified that he saw the Defendant periodically. He stated, "If you told me he burned the courthouse down I'd believe you. But these things that he's charged with here, I just, I just don't believe he's guilty of them." Yates continued, "[I]t's just not in his nature."

The trial court considered the evidence presented, along with the victim impact statements and the pre-sentence report, and it ordered the Defendant to serve twenty-four years for the rape of a child conviction and eleven years for each aggravated sexual battery conviction. The trial court ordered the sentences to be served concurrently, for a total effective sentence of twenty-four years.

*State v. Joel Ernest Blanton*, No. M2007-01384-CCA-R3-CD, 2009 WL 537558, at *1-5 (Tenn. Crim. App. March 4, 2009) (footnotes omitted), *perm. app. denied* (Tenn. Aug. 24, 2009).

## C. Post-Conviction Hearing

Petitioner presented Lieutenant Donald Hutcherson from the TDOC who was assigned to the Charles Bass Correctional Complex (previously the Middle Tennessee Correctional Complex). One of his responsibilities was maintaining the visitor log for the prisoners. Through Lieutenant Hutcherson, petitioner introduced an arrival/departure report pertaining to inmate Bobby Joe Blanton, Jr. Mr. Blanton arrived at the correctional complex on January 9, 2001, from White County. He was eventually transferred to Southeastern Tennessee State Regional, the Bledsoe County facility, on May 17, 2001.

Lieutenant Hutcherson testified that for the first sixty days of confinement, only immediate family could visit without an approved application. He further noted that on March 31, 2001, Tammy M. Blanton visited Mr. Blanton for the first time. Multiple visits followed after that date. The visitor log for Mr. Blanton would have been available at the time of petitioner's trial.

The State introduced Mr. Blanton's Tennessee Sentence Inquiry generated by the Tennessee Offender Management Information System (TOMIS) through Lieutenant Hutcherson. The report indicated that Mr. Blanton's criminal record included, among other charges, burglary of a habitation from White County. The State also clarified that the first entry in Mr. Blanton's arrival/departure report was the "Sentence Imposed Date" (SID) of December 26, 2000, when he was sentenced on the burglary conviction and booked into the White County Jail. The State also questioned Lieutenant Hutcherson with regard to a Visitation Approval List, which indicated that Tammy M. Blanton was Mr. Blanton's wife and thus was an approved visitor. Lieutenant Hutcherson testified that Ms. Blanton's last visit with Mr. Blanton was January 5, 2003. Mr. Blanton's arrival/departure report indicated that on January 8, 2003, his status changed from "Bledsoe" to "release eligibility," meaning that Mr. Blanton was released on parole that day. The record of Ms. Blanton's visits was seventeen pages long, indicating that she visited on nearly every possible opportunity.

Petitioner called his trial counsel as a witness at the post-conviction hearing. Trial counsel had been practicing law since 1997 and operated offices in White and Putnam Counties. His practice involved criminal law, bankruptcy, domestic relations, and debt collection. The criminal defense portion of his practice averaged thirty to forty percent of his caseload each year. The trial court appointed trial counsel to represent petitioner on January 12, 2006. Petitioner was incarcerated in the Van Buren County Jail at the time, awaiting trial on three counts of rape of a child involving three separate victims. Trial counsel recalled that he thought he had handled some sex offense cases at the time of petitioner's case but did not think he had taken the cases through a jury trial.

When trial counsel received discovery, he reviewed the information and noted that there was no physical evidence. He interviewed the nurse practitioner who had conducted the physical examinations of the children and reviewed her records. He learned that the hymens of all three victims were intact. Trial counsel considered motive, asking why the victims would accuse petitioner of those acts. Petitioner alluded to some "bad blood" between the victims' family and himself that involved allegations of theft. Counsel pondered how he could impeach the victims' credibility. He reviewed the taped interviews from the Department of Children's Services (DCS) and had someone transcribe them. He accessed school records to determine whether they had any disciplinary issues. He learned that the children had all been good students with no behavioral problems.

Trial counsel spoke with petitioner multiple times. They discussed possible trial witnesses. He thought petitioner's parents retained a private investigator, but he was not certain of his memory. He believed he might have asked the investigator to assist in obtaining proof of criminal convictions for one of the State's witnesses, Pam Gibson. Trial counsel did not recall whether he provided petitioner with a copy of the discovery he received. He did not document everything that he did in the case file. Trial counsel recalled that the State offered to settle the case and that he relayed the offer to petitioner. He believed that the offer was for petitioner to plead guilty and serve twelve or fourteen years. Petitioner did not accept the State's offer.

Prior trial counsel, an assistant district public defender, filed a motion for a Bill of Particulars requesting that the State provide specific dates of the offenses. The State could not provide specific dates, only the time frame, asserting that petitioner committed the offenses between January 9, 2001, and February 28, 2001. Trial counsel recalled petitioner was in the Army National Guard during that time. Although he still had his original file, trial counsel had not reviewed it prior to the hearing and did not recall whether Pam Gibson testified that petitioner spent the night with her on the night the offenses occurred because he had to report for guard duty the following morning. Counsel did, however, recall that petitioner could not provide him any information to either prove or disprove the statement. Trial counsel did not recall petitioner ever asking him to obtain records from the National Guard regarding his attendance at drill that weekend.

In the discovery, trial counsel had information concerning the allegations made against petitioner by Tammy Blanton on behalf of her three female children. He knew that she would testify that the offenses against her children occurred between January 9, 2001, and February 22, 2001. In her statement, she maintained that she knew the specific date because on that particular weekend she drove to Nashville to visit her husband in prison. She also remembered that she was snowed in and had to spend the night, so that particular night was the only night petitioner could have committed the offenses. Trial counsel did not obtain the visitor log for the time in question in order to confirm or deny her recollection and statement. He determined that it was unimportant because one of the victims said in her statement that her mother was present in the home when the offense occurred. To him, it was a point of impeachment that the mother claimed she was not home and the girl claimed that mother was home. Post-conviction counsel elicited a statement from trial counsel that if there were records that demonstrated Ms. Blanton never visited Mr. Blanton in prison during the specified time, "I think it would have helped, yes." Trial counsel testified that he tried to use the internet to confirm whether it had snowed in Nashville as Ms. Blanton stated, but he could not find any useful information.

-10-

At trial, counsel did not file a motion for funds with which to hire a private investigator. Neither did he file a motion to continue the trial to give him more time to prepare. Aside from impeaching the children regarding whether their mother was at home during the alleged offenses, trial counsel planned to impeach the children's credibility through direct examination of the nurse practitioner. He expected her to testify that the hymen of all three victims was still intact, which he would use to support the defense that petitioner did not commit the offenses.

Trial counsel testified that he asked for a recess at the close of the State's proof at trial so that he could confer with petitioner and decide whether petitioner would testify. Counsel and petitioner had a serious discussion about the decision to testify before trial began. Trial counsel visited petitioner on the night before trial and showed him videotapes of the victims' interviews. He did not remember whether he provided a transcript of the interviews to petitioner before that time. He did not provide petitioner with an outline of questions that he would ask on direct examination. He did not have another attorney come to the jail to practice cross-examination with him. Trial counsel testified that petitioner could not help the case very much with his testimony because he could not remember anything.

Trial counsel did not recall interviewing Detective Chris Isam,[3] who was listed as the State's first witness. Because the State had no physical evidence and petitioner had not confessed, trial counsel felt that Detective Isam was the "figurative" prosecutor of the case on behalf of the children. He did not recall when he received a copy of the jury instructions and did not recall whether he objected to any portion of the instructions. Trial counsel agreed that it was the attorney's responsibility to contemporaneously object and preserve issues for appeal. He also agreed that it was the trial attorney's responsibility to preserve issues for appeal in a motion for a new trial. He did not recall whether he or someone else drafted the motion for new trial.

At the evidentiary hearing, the State cross-examined trial counsel and highlighted the fact that petitioner maintained his innocence throughout the proceedings and that he never confessed. Trial counsel testified that he did not file a motion to suppress petitioner's statement because he did not recall petitioner making a statement admitting to any wrongdoing. He concluded that the motion was unnecessary.

Trial counsel further testified that if petitioner had mentioned that he had guard duty and thus had an alibi for the time in question, he would have obtained the necessary records and used the information at trial. As far as establishing an alibi defense, trial counsel

---

[3]Detective Isam's name was spelled "Issam" in the opinion on direct appeal. The court reporter transcribed it as "Isam" in the transcript from the post-conviction hearing.

testified that petitioner "couldn't remember ever being [in the home]." Petitioner never provided the name of any person who could place him at another location. No member of petitioner's family came forward to provide an alibi defense.

While trial counsel specifically recalled interviewing the nurse practitioner, he testified that he also drove to the victims' schools, served subpoenas, and tried to gather information that would assist in petitioner's defense. Petitioner did not understand why the children made the allegations against him, and trial counsel was trying to find some motive by interviewing different individuals. However, petitioner gave trial counsel no information regarding potential witnesses that he could interview.

Trial counsel did not recall whether he interviewed Ms. Blanton, the mother of the three victims. He recalled reviewing the taped DCS interviews of the children. He also did not remember whether he spoke with the other witness for the State, Pamela Gibson. When Ms. Blanton testified, trial counsel impeached her with a prior conviction, attempting to discredit her testimony. He tried to impeach Ms. Gibson with a prior conviction, but it was a worthless check charge from five or six years earlier.

Ms. Gibson's testimony at trial corroborated the assertions of Ms. Blanton and two of the victims that on the night petitioner committed the offenses, Ms. Blanton was away visiting her husband in prison and snow prevented her from leaving Nashville. Ms. Gibson was allegedly in the home with the children that night. She testified that she saw petitioner in the bed with his arm around B.M.'s shoulder, which prompted her to ask the child if petitioner had touched her. B.M. answered, "No."

Through discussions with petitioner, trial counsel learned that the "bad blood" between petitioner and Bobby Blanton began sometime after the children made the allegations against petitioner. Counsel informed petitioner that it was not relevant. Every time trial counsel met with petitioner, trial counsel became frustrated because he could not find a motive for the allegations of the victims. Trial counsel repeated his strategy to petitioner about impeaching the victims' testimony at trial. Petitioner could not assist counsel in establishing any other trial strategy.

Trial counsel asked petitioner about whether Bobby Blanton would be a helpful witness. Petitioner believed that Mr. and Ms. Blanton had convinced the victims to make the allegations. Based on that, trial counsel did not think Mr. Blanton would be a suitable witness for the defense.

Trial counsel testified that he met with petitioner probably less than ten times, stating that "there's only so many times that you can meet with them and get useful information or

inform them of what's going on." He testified that a huge problem with petitioner's case stemmed from contemporaneous (but unrelated) criminal charges in Van Buren County, wherein he was represented by a different attorney. One month before trial counsel was appointed to petitioner's case, the other attorney allowed petitioner to plead guilty to several charges that could then be used as impeachment. Petitioner knew that he would not be in a good position to testify because he had just entered multiple guilty pleas in December prior to trial. Trial counsel informed petitioner several times before trial and just before petitioner testified that the prior convictions could be used to impeach his testimony. Trial counsel reviewed all of the "pro's and con's" of petitioner testifying. Counsel was upset that petitioner did not inform his Van Buren County attorney about the pending charges against him. Trial counsel filed a pre-trial motion to exclude the Van Buren County convictions but was unsuccessful. Petitioner still chose to testify.

After the jury convicted petitioner, trial counsel met with petitioner again. Petitioner told trial counsel that he thought counsel did a good job and did not have any animosity toward him. Petitioner did not testify at the post-conviction hearing.

## II. Analysis

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (citing *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane*, 316 S.W.3d at 562 (quoting *Grindstaff*, 297 S.W.3d at 216).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Questions regarding the credibility of witnesses are matters entrusted to the trial judge as the trier of fact. *Dellinger*, 279 S.W.3d at 292 (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact carry the weight of a jury verdict and are conclusive on appeal unless the preponderance of the evidence is otherwise. *Rigger v. State*, 341 S.W.3d 299, 307 (Tenn. Crim. App. 2010) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997)). However, conclusions of law receive no presumption of correctness on appeal. *Rigger*, 341 S.W.3d at 307 (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective

assistance of counsel claims is de novo with no presumption of correctness. *Dellinger*, 279 S.W.3d at 294 (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn.1975)). The constitutional right to counsel attaches when adversarial judicial proceedings are initiated against the defendant. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980). "Initiation" is construed as issuance of an arrest warrant, the time of the preliminary hearing in cases where an arrest warrant is not first issued, or by indictment or presentment issued by a grand jury. *Id.* at 286.

To prevail on his claim of ineffective assistance of counsel, petitioner must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Finch*, 226 S.W.3d at 315; *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Baxter*, 523 S.W.2d at 936)). To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Strickland*, 466 U.S. at 688). As our supreme court has previously held:

> '[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.'

*Baxter*, 523 S.W.2d at 934-35 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974)). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689); *see Finch*, 226 S.W.3d at 316.

To establish that petitioner suffered prejudice as a result of counsel's deficient performance, petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch*, 226 S.W.3d at 316 (quoting

*Vaughn*, 202 S.W.3d at 116). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 694); *see Finch*, 226 S.W.3d at 316. As such, petitioner must establish that his attorney's deficient performance was of such magnitude that he was deprived of a fair trial and the reliability of the outcome was called into question. *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694; *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

Petitioner must establish both deficient performance and prejudice therefrom to be entitled to post-conviction relief. *Vaughn*, 202 S.W.3d at 116; *Howell*, 185 S.W.3d at 326. It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

## A.  Failure to Obtain Visitor Logs from TDOC

Of the several issues petitioner addressed at the hearing on the petition for post-conviction relief, he pursues only one on appeal: whether trial counsel was ineffective for failing to investigate potential evidence, specifically, the visitor logs from TDOC.

Petitioner asserts that the State relied upon the time frame of January 9, 2001, through February 22, 2001, as the period in which petitioner committed the offenses. He argues that Lieutenant Hutcherson's testimony clearly demonstrated that had Ms. Blanton visited her husband during that time frame, the TDOC visitor logs would have so indicated. Petitioner claims that trial counsel's strategy of impeaching the witnesses by inconsistent statements only encompassed an attempt to impeach, not an impeachment certain, because credibility must be weighed by the jury. According to petitioner, the fact that trial counsel attempted to impeach Ms. Blanton and Ms. Gibson regarding prior convictions did not remove his obligation to further attack the veracity of their testimony. He advances that the visitor logs went "to the heart of the case." Petitioner asserts that if trial counsel had the records from TDOC at the time of trial, he would have been able to clearly establish that the offenses could not have occurred during the period on which the State relied. Further, petitioner argues that his National Guard records and a record of snowfall in Nashville on any of the "seven or eight possible days" within that time frame would have further bolstered his position.

In ruling on this issue, the post-conviction court made verbal findings of fact. In sum, the post-conviction court found that one of the victims stated that her mother was at home on the night in question, while the other victims and other witnesses stated that she was not at home. The court found that trial counsel did not think the TDOC records were necessary because the issue was "well-clouded." The post-conviction court further found that trial counsel additionally sought to impeach the adult witnesses with prior convictions. Finally,

the post-conviction court found that trial counsel presented the testimony of a nurse, whose testimony that the victims were "virginal" impeached their credibility.

In its written findings of fact, the post-conviction court summarized:

At trial, State['s] witnesses testified that the victims' mother was visiting a prison and was unable to return home on the night of the crimes. The Petitioner presented the testimony of Donald Hutcherson and introduced copies of prison visitation records. These visitor logs did not contain the name of the victims' mother during the time of the crimes. The petitioner established that, prior to trial, [trial counsel] did not request these prison visitation records. The Petitioner contends that had [trial counsel], prior to trial, obtained prison visitor logs, [the] State['s] witnesses could have been impeached. When confronted with this allegation, [trial counsel] responded that one of the children had stated that her mother was home on the night of the crime. [Trial counsel] believed that because of this child's statement, the "waters were muddied" regarding the mother's whereabouts.

The court further found that "whether [trial counsel] could establish that the victims' mother was not at the prison does not erode its confidence in the Petitioner's conviction." In so ruling, the post-conviction court not only found that counsel's performance was not deficient but that petitioner was not prejudiced as a result of his representation.

We are constrained to hold otherwise. This case turned solely on the credibility of the witnesses. One of the victims, T.M., testified that her mother was snowed in overnight while visiting the prison. On cross-examination, T.M. said she was "certain" her mother was away. However, in the videotaped interview with DCS, T.M. said that her mother was at home when the incidents occurred. The other two victims testified that Ms. Blanton was away from home on the night in question. Ms. Blanton and Ms. Gibson also testified that Ms. Blanton was snowed in overnight and away from home. Thus, whether Ms. Blanton was home during the alleged incidents was a pivotal fact used by the children and Ms. Blanton herself in narrowing the time frame relied upon by the State.[4]

---

[4] We are aware of the many cases opining that a variance between the dates specified in an indictment and the proof at trial is immaterial. *See, e.g., State v. Brown*, 992 S.W.2d 389, 392 (Tenn.1999) (finding that although the State elected an offense in a range of dates and the proof showed that the offense happened before the beginning point of the range, the evidence was not insufficient because the State was not required to prove that the offense was committed on a specific date). However, in this case, the evidence was highly relevant for impeachment purposes, as well.

The prison visitation logs were essential to the defense for several reasons. If the jury believed that Ms. Blanton was, in fact, away from home visiting her husband in prison when she was snowed in, the prison logs would have demonstrated that the alleged offenses occurred outside of the time relied upon by the State and embodied by the indictment because Ms. Blanton did not visit her husband during January or February of 2001. Further, Ms. Blanton testified that she was away from home during the time of the alleged offenses against her children and that she was visiting her husband in prison. The prison visitation logs would have clearly and unequivocally demonstrated that she was not at the prison, thus contradicting her testimony. This case turned completely on the credibility of the State's witnesses versus petitioner's witnesses. The evidence would have irrefutably impeached her credibility regarding where Ms. Blanton purported to be that night. Petitioner's National Guard records and weather reports from the time frame would have buttressed the prison visitor logs, as well.

In the context of a direct appeal, our supreme court has held that "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which [the] proof exceeds the standard required to convict . . . .'" *State v. Garrett*, 331 S.W.3d 392, 405 (Tenn. 2011) (quoting *Spicer v. State*, 12 S.W.3d 438, 447 (Tenn. 2000)). "'The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits.'" *Id.* (quoting *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn. 2003)). This statement of law is helpful in our analysis of this case. The State's evidence consisted solely of the testimony of the three victims, disclosed approximately two years following the alleged offenses. The medical testimony could not confirm that the children were subject to sexual abuse. At trial, Ms. Blanton testified that when the victims disclosed petitioner's abuse of them approximately two years later, she recalled where she lived at the time the children alleged the abuse happened and where she was during the time. She relied upon certain circumstances, namely visiting her husband in prison on a day when she became snowed in, was forced to spend the night in a hotel, and could not return home, in reconstructing her memory. Applying the supreme court's logic, this case falls within the range of those cases where the proof only marginally exceeded the standard required to convict. As such, the error in failing to obtain and use the prison visitor logs as impeachment evidence was proportionately greater. If the jury had been informed of the discrepancy in the evidence created by the TDOC visitor log, a reasonable probability exists that its assessment of the credibility of the witnesses would have resulted in a different outcome at trial. *See Finch*, 226 S.W.3d at 316. This court's confidence in the outcome of this at trial is undermined by counsel's failure to procure and utilize the prison visitor logs at trial.

We do not place this case in the category of those in which "[c]ounsel should not be deemed to have been ineffective merely because he failed to employ additional modes of

impeachment which may or may not have produced a different result." *Raymon Haymon v. State*, No. W2005-01303-CCA-R3-PC, 2006 WL 2040434, at *10 (Tenn. Crim. App. July 10, 2006) (citing *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980)). Rather, the convictions in this case rested solely on the credibility of witnesses. In such a situation, counsel should have obtained the available impeachment evidence for use at trial. We cannot say that his failure to do so did not affect the outcome of the proceedings. Petitioner suffered prejudice as a result of trial counsel's failure to procure the prison visitation logs.

### B. Remaining Claims Not Addressed On Appeal

Although our ruling with regard to the prison visitation log is dispositive of this case, to assist with any further appellate review, we note that petitioner presented evidence at the post-conviction hearing, and the post-conviction court made findings of fact, on the following issues of ineffective assistance of counsel petitioner raised in his petition for relief:

1)      failure to file a motion to suppress petitioner's statement to law enforcement;

2)      failure to file a notice of alibi;

3)      failure to interview the State's witnesses;

4)      failure to call Bobby Joe Blanton as a witness for petitioner;

5)      failure to maintain contact with petitioner and prepare him for his testimony and for trial;

6)      failure to object to "reckless" charge as a mens rea; and

7)      failure to object to "knowing" as a "nature of the conduct" definition.[5]

---

[5] Post-conviction counsel offered argument regarding issues six and seven in his closing statements to the post-conviction court. By not raising the issues on appeal, petitioner has again abandoned these claims for further review. *See Ronnie Jackson, Jr.*, 2009 WL 3430151, at *6 n.2. Further, the propriety of the jury instructions was raised and addressed on direct appeal. *Joel Ernest Blanton*, 2009 WL 537558, at *13 n.3, *14. Although this court reviewed the jury instructions under a plain error standard of review because trial counsel did not preserve the issue, we nonetheless found that the instructions were proper and followed the statutory mandates. We cannot hold that this court would have reached a different conclusion employing a de novo review. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001) (holding that, as a mixed question of

(continued...)

-18-

By failing to argue these issues on appeal, petitioner has effectively abandoned these claims for further review. *See Ronnie Jackson, Jr. v. State*, No. W2008-02280-CCA-R3-PC, 2009 WL 3430151, at *6 n.2 (Tenn. Crim. App. Oct. 26, 2009) ("[w]hile the Petitioner raised additional issues in his petition for post-conviction relief, he has abandoned those issues on appeal"), *perm. app. denied* (Tenn. Apr. 16, 2010).

## CONCLUSION

We have carefully reviewed the record, the parties' briefs, and the applicable case law. Finding that trial counsel's error prejudiced the outcome of the case, we reverse petitioner's convictions and remand the case for a new trial.

_____
ROGER A. PAGE, JUDGE

---

[5](...continued)
law and fact, the standard of review of jury instructions is de novo).